## IN THE UNITED STATES DISTRIC COURT FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | |
|---|---|
| MONICA STERLING,<br><br>              Plaintiff,<br><br>      v.<br><br>OURISMAN CHEVROLET OF BOWIE,<br>INC.,<br><br>     and,<br><br>ALLY FINANCIAL, INC. F/K/A GMAC<br>INC.,<br><br>     and,<br><br>HENRY HYLTON,<br><br>     and<br><br>WILLIAM TALIAFERRO,<br><br>     and<br><br>LEW GILINSKY<br><br>          Defendants. | Case No. |

Pursuant to Fed. Rule Civ. Proc. Rule 3, Plaintiff, Monica Sterling ("Ms. Sterling"), through her undersigned counsel, brings these claims against the Defendants, and in support of these claims, states as follows:

### JURISDICTION

1. This is an action for violations of 15 U.S.C. § 1692 et seq. (Fair Debt Collection Practices Act), 18 U.S.C. § 1961 et seq. (Racketeer Influenced and Corrupt Organizations Act), 15 U.S.C. 1601 et seq. (Truth in Lending Act), 15 U.S.C. § 1681 et seq. (Federal Fair Credit Reporting Act), 15 U.S.C. § 1691 et seq. (Equal Credit Opportunity Act), 15 Md. Code, Com. Law Art. §13-101 et seq. (Maryland Consumer Protection Act), 15 Md. Code Ann. § 14-201 et seq.  (Maryland Debt Collections Practices Act), and the Common Law Torts of Fraud and Negligence (breach of fiduciary

duties).   The court has subject matter jurisdiction of this
action via federal question and supplemental jurisdiction.

2. This Court has personal jurisdiction over Defendants named herein
because a substantial part of the wrongdoing alleged in this
Complaint took place in the State of Maryland, and Defendants
regularly do business in Maryland.

3. Venue is appropriate pursuant to 28 U.S.C. §§ 1408 - 1409.

**PARTIES**

4. Ms. Sterling is a resident of the State of Maryland, and resides
at 1001 Kings Tree Drive, Bowie, Maryland 20721.

5. Defendant Ourisman Chevrolet of Bowie, Inc. ("Ourisman") is a car
dealership located at 16610 Governor Bridge Road, Bowie, Maryland
20716.  Its principal place of business is 15301 Frederick Road,
Rockville, Maryland 20855, and its registered agent is listed as
James M. Hastings at 305 Piping Rock Drive, Silver Spring,
Maryland 20905.

6. Defendant Ally Financial, Inc., formerly known as General Motors
Acceptance Corporation ("GMAC"), is headquartered in Detroit,
Michigan, but incorporated in the State of Delaware, with its
registered agent listed as The Corporation Trust Company,
Corporation Trust Center, 1209 Orange Street, Wilmington,
Delaware 19801.

7. Defendant Henry Hylton ("Hylton") works for Ourisman as a
business manager.  His address is unknown.

8. Defendant William Taliaferro ("Taliaferro") works for Ourisman as
a financial officer.  His address is unknown.

9. Defendant Lew Gilinsky ("Gilinsky") works for Ourisman as a
general manager.

## GENERAL FACTUAL ALLEGATIONS

10. On September 11th, 2012, at about 10:30 AM, Ms. Sterling walked onto the lot of Ourisman Chevrolet of Bowie to purchase a vehicle.

11. Ms. Sterling needed to replace her 2007 Chevrolet Trailblazer LT ("Trailblazer") with a smaller vehicle that would put less strain on her arms and chest since she had developed Complex Regional Pain Syndrome ("CRPS") in her left arm and hand and had had a breast cancer surgery earlier in the year, causing a partial disability of her left arm and hand.

12. She walked through the show room and encountered Cierra Johnson, an Ourisman salesperson, who told her that she could help her.

13. Ms. Sterling explained to Johnson why she needed to purchase a vehicle and that she was looking for a Traverse.

14. Johnson walked Ms. Sterling out on the lot to show Ms. Sterling the Traverse models.

15. After that, Johnson took Ms. Sterling inside to determine what features were in stock for the various models and to make sure that there was a "fully loaded" model available (i.e. GPS navigation, rear view camera, lane change alarm, smaller steering wheel, etc.).

16. Ms. Sterling then test drove the vehicle with the identified "fully loaded" features.

17. When she returned Gilinsky approached her and mentioned that she had a good payment history with GMAC, and asked Ms. Sterling whether she would take the vehicle if they could get her a payment of a certain amount per month and Ms. Sterling said absolutely.

18. Gilinsky then handed off Ms. Sterling to Hylton who reviewed her application, asked her about what her bank statements show, and subsequently pulled her credit report.

19. Hylton then explained that financing usually only required the three (3) most recent monthly bank statements, but now they were requiring bank statements plus a copy of a Schedule C.

20. Ms. Sterling asked if that was all they needed, to which Hylton replied yes, and then said that they should proceed to signing the contracts and Ms. Sterling could return with the bank statements and Schedule C later.

21. As they were signing the documentation for the Traverse, Johnson informed them that she had contacted GMAC regarding the balance of the note on Ms. Sterling's Trailblazer and that it was $2,000 more than originally believed.

22. At about the same time, Hylton stated that they needed to stop the paperwork because they had misquoted the price of the Traverse to Ms. Sterling by about $10,000, and therefore the cost of the Traverse would be more.

23. Ms. Sterling responded that it was not acceptable for them to give her one price and then change it.

24. Hylton suggested that Ms. Sterling could get a fully loaded Equinox for the price they quoted on the Traverse.

25. By this time it was about 6:30 PM and Johnson was preparing to leave, so Ms. Sterling left and decided later that night to return to see the Equinox because of her great need to replace the Trailblazer.

26. The next day, September 12th, 2012, Ms. Sterling returned to the lot at about 3:00 PM and brought with her the precise documentation that Hylton had requested, including three (3) months of bank statements and a Schedule C.

27. Ms. Sterling saw Johnson and asked to drive the Equinox.

28. After the test drive Johnson handed Ms. Sterling back off to Hylton.

29. Now in Hylton's office, Ms. Sterling presented the documents to Hylton who stated, "Perfect that's all I need."

30. Ms. Sterling told Hylton that she had prepared the Schedule C, but that it had not been filed.

31. Hylton then told Ms. Sterling that she could not get a fully loaded Equinox for the same monthly payment and rate that they had discussed the previous day and that the payment would be

$800 per month, not the $650 that he had represented the previous day.

32. Ms. Sterling responded that she would not agree to that and that the maximum monthly payment she would agree to pay was $650.

33. Ms. Sterling reiterated that she would only buy the Equinox if they could meet their original offer.

34. At this point Hylton left his office and went to Gilinsky and slammed the papers on the desk in front of him and told him that he should take care of Ms. Sterling.

35. Gilinsky then told Ms. Sterling not to worry, that he would get it together, that he would talk to Hylton about how to properly do business, and that she should wait outside.

36. Later, an employee named Goins approached Ms. Sterling and told her that they had worked it out and asked to confirm that she would agree to take the vehicle if they could get the payment to $650 per month, and she again agreed that she would.

37. Goins told Ms. Sterling that he would finish up the documentation to finalize the transaction.

38. At this point, Robert, who identified himself as the owner's son, apologized and reiterated that they could get her vehicle for the price she was expecting.

39. Robert began discussing specific amounts on the contracts.

40. At this time, Robert told Ms. Sterling that she would need to deposit $1,000 in order to have a contract, plus an additional $800 to be dated for payment on a future date (September 20th, 2012).

41. Robert emphasized that the vehicle would not be hers unless and until she signed papers confirming that she continued to owe $800 and that once the $800 cleared, the transaction would be final.

42. Robert told Ms. Sterling that she could go ahead and sign over the title to the Trailblazer, and she asked whether her husband had to sign as well, since he was also on the title.

43. Robert said no, then, after talking to Taliaferro said yes, but that her husband did need to sign that day, and instead they

could finish the transaction without him as long as he came in the next day to sign the title over.

44. Ms. Sterling agreed to the trade-in terms, as well as the purchase and sale terms offered, and signed a State of Maryland Vehicle Sales Contract approved by Robert, for a 2012 Chevrolet Equinox LTZ (the "Equinox").

45. Ms. Sterling also agreed to the financing terms and signed a Retail Installment Sale Contract identifying Ourisman Chevrolet of Bowie as "Creditor-Seller" and signed by Robert.

46. By the time Ms. Sterling was finished it was 9:00 PM and Ms. Sterling left the Ourisman lot believing her purchase of the Equinox was final.

47. She had been given one key and instructed to return the next day to have her husband sign over title and receive the second key, which they did.

48. Shortly after that, Ms. Sterling received a welcome letter and a welcome email thanking and congratulating her on the purchase of the Equinox.

49. About sixteen (16) days after the purchase, Taliaferro called Ms. Sterling to tell her that she was now required to sign an IRS form 4506-T.

50. Ms. Sterling asked why she needed to sign more documents and Taliaferro responded that GMAC had called them to ask whether or not she had signed the form.

51. Taliaferro told her that it was not a big deal and that she would just need to sign it and fax it to them, which she did.

52. In fact, GMAC had called Ms. Sterling about three (3) hours before to ask if she had signed it and told Ms. Sterling that Ourisman knows that she would need to sign the form in order for the transaction to be financed.

53. The GMAC representative further stated that someone at Ourisman had told them that they had already talked to Ms. Sterling, but, no one from Ourisman had spoken to Ms. Sterling by that time.

54. Ms. Sterling did not know what the IRS form was for and decided to research into the form.

55. After knowing what the form is for, Ms. Sterling called Taliaferro back to explain that she wanted to make it clear that this was a new requirement, and that she would submit it to fully cooperate, but submitting the form was not required originally.

56. Ms. Sterling also explained to Taliaferro that she had an extension for filing the 2011 tax return and had not yet filed it.

57. Taliaferro responded that he would see what he could do about either forcing GMAC to take the financing or finding an alternative source of financing, but not to worry and that everything would be fine.

58. About four (4) days later, Johnson left Ms. Sterling a voice mail to call them about the Equinox.

59. The next day Ms. Sterling called Taliaferro, and with a nasty and demeaning tone he told her that she needed to bring them the Equinox, since they were unable to get the financing through anywhere.

60. After reminding him that she was out of town and would not be back until late on October 5th, 2012, they agreed she would return to the dealership on October 6th, 2012.

61. On October 6th, 2012, at about 9:15 AM, Ms. Sterling brought the Equinox back, and when she walked into the waiting area, she saw Goins and asked him for assistance.

62. Goins brought her to Taliaferro's office where Taliaferro asked Ms. Sterling if she could get a co-signer.

63. Since this was the first time that having a co-signer was discussed, and since it was being requested after the transaction had already occurred, Ms. Sterling made it clear that she would not be obtaining a co-signer.

64. Taliaferro asked for the key, which Ms. Sterling gave him, and he inspected the Equinox while Johnson transferred the license plates.

65. Ms. Sterling asked Taliaferro about her deposit and he told her that they would mail her the difference.

66. Ms. Sterling asked Taliaferro what he meant by "the difference" and he did not reply; however, Taliaferro alluded to the fact that they would have to see how much Ms. Sterling had driven the Equinox.

67. Ms. Sterling started to become highly agitated and nervous and distressed because she began to realize that the Defendants might not return her money and that they were trying to swindle her.

68. As they were walking outside to look at the vehicles Taliaferro became loud, and in the presence of third parties, started making comments about how Ms. Sterling needed to deal with her credit, and get in touch with GMAC to straighten out her financing.

69. These comments were made in the presence of unknown third parties.

70. Ms. Sterling told Taliaferro to lower his voice and stated that she needed to know what they were going to do about the money she paid.

71. Ms. Sterling told Taliaferro that she needed documentation regarding the money and he told her that no dealership does that.

72. Ms. Sterling demanded some proof of the fact that she turned the Equinox into Ourisman.

73. At this point, Ms. Sterling was told to wait outside.

74. While outside, Ms. Sterling saw the Trailblazer and noted that it had been sold, driven 100 miles, did not start properly, and the "check engine" light was on.

75. Ms. Sterling walked into the building and saw Taliaferro with Goins at a computer and told them about the Trailblazer and asked them if they had sold it.

76. Goins said that they had and that they had to buy it back.

77. Taliaferro mentioned how many miles Ms. Sterling had driven the Equinox and that she would need to take a seat and wait.

78. Later Goins called Ms. Sterling into Robert's office where Goins explained how much Ms. Sterling had given them, what they did, and that she now owed them $1,400.

79. This was extremely distressing to Ms. Sterling who questioned how she could be responsible for them having sold the Trailblazer, and that they could not have it both ways by saying that the Equinox was not hers since the financing had not been completed, while also saying that she was responsible for them having sold the Trailblazer.

80. Ms. Sterling suggested to Goins that if they were trying to scam her she would need to call an attorney.

81. Goins told her that if she was going to call an attorney then he could not talk to her anymore.

82. Ms. Sterling told him that that was not acceptable and that someone needed to address her issue regarding the return of her money.

83. Shortly thereafter Gilinsky came into where Ms. Sterling was sitting and told her that "they" told him that she told "them" that she had the last two years tax returns available.

84. Ms. Sterling asked who "they" are and Gilinsky responded that it was Hylton.

85. Ms. Sterling responded that she never told Hylton that, and that Hylton had not even been part of the final transaction, since he handed her off to Goins when she would not agree to a higher monthly payment.

86. Gilinsky suggested that Ms. Sterling tell him what would be a fair resolution.

87. Ms. Sterling responded that she would be willing to pay an amount for the miles that she put on the Equinox, and Gilinsky added that she had not made a note payment and that payment should be made for that.

88. Ms. Sterling requested information regarding who had asked her to make a note payment, because she knew that it had not been GMAC, and in response, Gilinsky left telling Ms. Sterling that he would see what he could do.

89. By this time, Ms. Sterling became concerned that she might become sick as a direct result of the stress developing from the Defendants' actions.

90. Ms. Sterling called her husband for support and to determine what to do about the Defendants' conduct.

91. Later, Gilinsky came back to where Ms. Sterling was and told her that he was going to give her back all her money within four (4) days.

92. Ms. Sterling asked Gilinsky to put the promise in writing, and Gilinsky responded by confirming the return of Ms. Sterling's deposit by writing the agreement on the back of his business card.

93. Defendants have failed to refund the deposit.

94. Moreover, Defendants replaced the tires on the Trailblazer causing Ms. Sterling to lose a warranty she had on them.

95. Ms. Sterling has incurred late fees for the months of September and October for not paying the car note for her Trailblazer.

96. The Trailblazer is extremely difficult for Ms. Sterling to drive, and she has to rely on others to drive her anywhere requiring more than one or two turns.

### Count I: Violation of Fair Debt Collection Practices Act

97. Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

98. Defendants are subject to the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692 et seq. ("FDCPA").

99. Ms. Sterling was a "consumer" under 15 U.S.C. § 1692a(3).

100. Defendants are creditors and debt collectors under 15 U.S.C. § 1692a.

101. Defendants committed acts in violation of the FDCPA in conjunction with its credit and collection activities related to a "debt" under FDCPA.  15 U.S.C. § 1692a(5).

102. Defendants violated 15 U.S.C. § 1692d, which prohibits, "engag[ing] in any conduct the natural consequence of which is

to harass, oppress, or abuse any person in connection with the collection of a debt," and 15 U.S.C. §1692e(2), which prohibits, "false representation of— (A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt," and 15 U.S.C. § 1692e(10), which prohibits, "the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," and 15 U.S.C. §1692f, which prohibits, "use[ing] unfair or unconscionable means to collect or attempt to collect any debt[,]" by: (1) consistently using aggressive and demeaning tones as stated in ¶¶'s 31, 34, 59, and 68-70 (2) bait and switch (A) misrepresenting the price of the vehicles as stated in ¶¶'s 14-15, 21-22, 31, and 36, (B) selling a vehicle then requiring it be returned and changing the terms required to keep the vehicle, (3) misrepresenting by saying that (A) the deal was final as long as the husband the signed and the $800 cleared, (B) what she needed to provide as far as documentation, (C) that she did not have the legal right to keep the Equinox and that she was required to return it, (D) that Ms. Sterling owed Defendants certain original and subsequent amounts, (E) that they intended to sell the Equinox under the original terms, and (F) that the financing would take care of itself.

103.    Defendants violated 15 U.S.C. §1692e(7), which prohibits "The false representation or implication that the consumer committed any … conduct in order to disgrace the consumer," by (1) implying that she lied about having filed tax returns, (2) berating Ms. Sterling in front of other customers and/or employees about her needing to fix her credit, her being unable to properly finance the vehicle, and her having to return the vehicle, as stated in ¶¶'s 34, 59, and 68-70.

104.    Defendants violated 15 U.S.C. §1692e(8), which prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be

false…" by knowingly promising Ms. Sterling that financing the vehicle would only require Ms. Sterling to provide the three most recent monthly bank statements and to bring in a Schedule C form, and that she would not have to provide the last two years' full tax returns or any other documentation.

105.    Defendants violated 15 U.S.C. § 1692e(11), which prohibits, "[t]he failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector."

106.    Defendants violated 15 U.S.C. § 1692e(15), which prohibits, "[t]he false representation or implication that documents are not legal process forms or do not require action by the consumer," by failing to disclose that Ms. Sterling's purchase was contingent upon some future condition, and would require Ms. Sterling to sign and/or provide additional documentation.

107.    Defendants violated 15 U.S.C. §1692f(1), which prohibits, "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law," by attempting to force Ms. Sterling to pay additional fees after returning the Equinox.

108.    Defendant violated 15 U.S.C. §1692f(2), which prohibits, "[t]he acceptance by a debt collector from any person of a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit."

109.    The debt collection practices involving misrepresentations, mismanagement, and lending directly subjected Ms. Sterling to increased debt, higher payments, and potentially damaged credit,

through no fault of her own and constitutes a significant financial harm, and unjust injury the Defendants cannot remedy through other means, and pursuant to 15 U.S.C. § 1692k, Defendants are liable for actual damage sustained, as well as any additional damages caused by a specific individual that does not exceed $1,000, and any costs of the action, including attorney's fees.

## Count II – Violating the Federal Racketeer Influenced and Corrupt Organizations Act

110.    Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

111.    Ms. Sterling asserts that Defendants' actions collectively constituted a violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

112.    RICO encompasses claims that typically arise in business litigation.

113.    Defendants are persons under 18 U.S.C. § 1961(3).

114.    Defendants were associated or employed by an "enterprise" under 18 U.S.C. § 1961(4).

115.    Under 18 U.S.C. § 1961(5), Defendants' said "pattern" consists of the commission of the predicate offense as detailed throughout.

116.    Defendants engaged in activity relating to "unlawful debt" practices as established through 18 U.S.C. § 1961(6) because the debt incurred in this transaction was unlawful because it was based on the gambling activities of Defendants in so far as they were making a gamble that the debt could be assigned by GMAC even though the Defendants did not obtain the proper documentation from Ms. Sterling.

117.    Under 18 U.S.C. § 1961(1), Defendants engaged in "racketeering activity" by extorting Ms. Sterling to pay higher rates than originally agreed upon through threatening and aggressive behavior as exhibited in ¶¶'s 31, 34, 59, and 68-70, and charging unfairly high prices through a bait and switch

scheme exhibited in ¶¶'s 14-15, 21-22, 31, and 36, as well as the Defendants actions relating to extortionate credit transactions, mail fraud, wire fraud, financial institution fraud, obstruction of justice, interference with commerce or extortion, racketeering, engaging in monetary transactions in property derived from specified unlawful activity, interstate transportation of stolen motor vehicles and property, and trafficking in certain motor vehicles.

118.    Under 18 U.S.C. 1962(c) it is, "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," which the Defendants violated by being employed by or associated with an enterprise engaged in activities which affect interstate commerce through a pattern of racketeering activity or the collection of an unlawful debt, and which were accomplished though periods of repeated past or present conduct and project into the future a threat of repetition, as exhibited in the claims established under ¶ 117.

119.    Ms. Sterling is entitled to damages under 18 U.S.C. 1964(c), which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"

### Count III: Violation of the Truth in Lending Act ("TILA")

120.    Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

121.    15 U.S.C. § 1601(a) states that the intent of TILA is to provide meaningful credit terms.

122.   Under 15 U.S.C. § 1638, retail installment contracts, when signed by the buyer, are the final written expression of the parties and are binding.

123.   Defendants are creditors under 15 U.S.C. 1601 et seq., which defines a creditor as, "[a] person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments . . and to whom the obligation is initially payable, either on the face of the note or contract, or by agreement . . . ."

124.   15 U.S.C. § 1638 requires creditors to provide disclosures to be made in every consumer credit transaction, including: (1) the creditor's identity; (2) the "amount financed"; (3) the "finance charge"; (4) the "annual percentage rate"; (5) the "total of payments"; (6) the payment schedule; and (7) the "total sale price."

125.   The TILA disclosures provided to Ms. Sterling state that Defendant Ourisman is the creditor.

126.   Defendants violated 15 U.S.C. § 1638 by (1) claiming afterwards that Ms. Sterling's purchase of the Equinox was contingent upon a financing issue; (2) failing to tell Ms. Sterling initially that the Defendants believed that the purchase of the Equinox was contingent upon a financing issue; (3) misrepresenting the documentary requirements of the financing; (4) demanding that Ms. Sterling return the Equinox; (5) misrepresenting that certain documentary requirements were necessary; (6) failing to offer the assignment for the face value of the installment sales contract; (7) demanding that Ms. Sterling pay for any costs associated with the Defendants failure to "obtain" financing for Ms. Sterling; (8) refusing to return the deposit; (9) failing to return the deposit; (10) providing meaningless and/or illusory credit terms (creditor disclaimer purporting condition of assignment); and (11) subjecting Ms. Sterling to the dealer's unilateral modification or revocation of contract, as are all exhibited in the Pertinent Facts exhibited in ¶¶'s 10-96.

127.    15 U.S.C. § 1640, provides that Defendants are liable to
Ms. Sterling in an amount for actual damages sustained, as well
as additional damages caused by a specific individual equaling
"twice the amount of any finance charge in connection with the
transaction," and any costs of the action, including attorney's
fees.

**Count IV: Violation of the Federal Fair Credit Reporting Act**

128.    Ms. Sterling incorporates by reference all of the preceding
paragraphs of this Complaint as if fully restated herein.

129.    Ms. Sterling is a "consumer" as defined by the Federal
Trade Commission's Fair Credit Reporting Act ("FCRA") under the
15 U.S.C. § 1681a(c).

130.    Defendants are "creditors" under 15 U.S.C. § 1681a(r)(5),
which is defined as "any person who regularly extends, renews,
or continues credit; any person who regularly arranges for the
extension, renewal, or continuation of credit; or any assignee
of an original creditor who participates in the decision to
extend, renew, or continue credit." (citing 15 U.S.C. § 1691a).

131.    15 U.S.C. § 1681a(k) defines the types of "adverse action"
as:

>        (i) a denial or cancellation of, an increase in any charge
>        for, or a reduction or other adverse or unfavorable change
>        in the terms of coverage or amount of, any insurance,
>        existing or applied for, in connection with the
>        underwriting of insurance…(iv) an action taken or
>        determination that is--(I) made in connection with an
>        application that was made by, or a transaction that was
>        initiated by, any consumer, or in connection with a review
>        of an account…and (II) adverse to the interests of the
>        consumer.

132.    Defendants violated 15 U.S.C. § 1681a(k) by acting
adversely to the interest of Ms. Sterling when handling her
application for the vehicle, as shown through their aggressive
behavior as exhibited in ¶¶'s 31, 34, 59, and 68-70, their
charging unfairly high prices through a bait and switch scheme
exhibited in ¶¶'s 14-15, 21-22, 31, and 36, and in doing so

making misrepresentations to Ms Sterling (the consumer) that resulted in the financing not properly being accepted, resulting in higher fees, loss of a vehicle she was reliant upon, additional profit for the dealership, and significant emotional harm, as exhibited in ¶¶'s 59, 64-70, 78-79, 88, and 93-96.

133.    15 U.S.C. § 1681m requires that the Defendants provide notice of the adverse action to Ms. Sterling, and to provide certain information about the consumer reporting agency that furnished the report to them.

134.    Defendants violated 15 U.S.C. § 1681m by failing to provide the required disclosures when they demanded that Ms. Sterling return the Equinox, take back the Trailblazer, and pay them money.

135.    15 U.S.C. § 1681b provides the permissible bases upon which a reporting agency may furnish a report, including 15 U.S.C. § 1681b(f), which states that:

> [a] person shall not use or obtain a consumer report for any purpose unless--(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

136.    Defendants violated 15 U.S.C. § 1681b(f) because they initially obtained Ms. Sterling's credit report when they completed a RISC without themselves ever intending to extend credit or honor the RISC, and when they knew or should have known that credit would not be extended or the RISC would not be honored, the Defendants ultimately did not have a permissible basis upon which to obtain Ms. Sterling's credit information.

137.    15 U.S.C. §§ 1681n(a) and 1681o provides that Defendants are liable to Ms. Sterling for monetary damages.

138.    Any person who willfully fails to comply with the FCRA with regards to any consumer is liable to that consumer in summation of:

(1)(A) any actual damages sustained by the consumer as a
result of the failure or damages of not less than $100 and
not more than $1,000; or(B) in the case of liability of a
natural person for obtaining a consumer report under false
pretenses or knowingly without a permissible purpose,
actual damages sustained by the consumer as a result of the
failure or $1,000, whichever is greater;(2) such amount of
punitive damages as the court may allow; and(3) in the case
of any successful action to enforce any liability under
this section, the costs of the action together with
reasonable attorney's fees as determined by the court. 15
U.S.C. § 1681n(a).

139.    Additionally, any person who negligently fails to comply
with the FCRA with regards to any consumer is liable to that
consumer in summation of:

(1) any actual damages sustained by the consumer as a
result of the failure; and (2) in the case of any
successful action to enforce any liability under this
section, the costs of the action together with reasonable
attorney's fees as determined by the court. 15 U.S.C. §
1681o.

**Count V: Violation of the Equal Credit Opportunity Act ("ECOA")**

140.    Defendants are "creditors" under 15 U.S.C. § 1691a, which
is defined as "any person who regularly extends, renews, or
continues credit; any person who regularly arranges for the
extension, renewal, or continuation of credit; or any assignee
of an original creditor who participates in the decision to
extend, renew, or continue credit."

141.    15 U.S.C. § 1691(d) requires a creditor to notify an
applicant for credit of its action on the application, and if
the action is adverse, the creditor must provide the applicant a
statement of reasons in writing or provide written notification
with disclosure of the applicant's right to a written statement
of reasons.

142.    Defendants violated 15 U.S.C. § 1691(d) by failing to
provide Ms. Sterling with the required written notices of their
adverse actions, as shown through their aggressive behavior
exhibited in ¶¶'s 31, 34, 59, and 68-70, their charging unfairly
high prices through a bait and switch scheme exhibited in ¶¶'s

14-15, 21-22, 31, and 36, and in doing so making
misrepresentations to Ms. Sterling (the consumer) that resulted
in the financing not properly being accepted, resulting in
higher fees, loss of a vehicle she was reliant upon, additional
profit for the dealership, and significant emotional harm, as
exhibited in ¶¶'s 59, 64-70, 78-79, 88, and 93-96.

143.    Under 15 U.S.C. § 1691e Defendants are liable to Ms.
Sterling for actual damages sustained, as well as for punitive
damages that are not to exceed $10,000, any costs of the action,
including attorney's fees, and any equitable and/or declaratory
relive that the court deems appropriate.

**Count VI:  Violation of the Maryland Consumer Protection Act**

144.    Ms. Sterling incorporates by reference all of the preceding
paragraphs of this Complaint as if fully restated herein.

145.    Defendants are subject to the Maryland Consumer Protection
Act, Md. Code, Com. Law Art. §13-101 et seq. ("MCPA"), as
merchants because they, "directly or indirectly either offers or
makes available to consumers any consumer goods, consumer
services, consumer realty, or consumer credit."   MCPA §13-101.

146.    The MCPA prohibits a person from engaging in "any unfair or
deceptive trade practice[.]"  MCPA §13-303.

147.    The MCPA provides that misleading statements constitute an
unfair trading practice and are defined as any, "[f]alse,
falsely disparaging, or misleading oral or written statement,
visual description, or other representation of any kind which
has the capacity, tendency, or effect of deceiving or misleading
consumers."  MCPA §13-301.

148.    Through themselves and/or their representatives, Defendants
committed unfair and/or deceptive trade practices by making
statements that had the capacity, tendency, and effect of
misleading Ms. Sterling into believing that she had been
approved for financing, when Defendants did not intend to
finance, or should have known that Ms. Sterling would eventually
not be financed, then making statements misleading Ms. Sterling

into believing that she had not been financed when had actually had been, and that she was required to return the Equinox, and that she could not keep the Equinox and continue to make payments; and then made misleading statements about Ms. Sterling being responsible for the financing not being approved; made misleading statements about Ms. Sterling being required to pay Defendants more money, as exhibited as exhibited in ¶¶'s 59, 64-70, 78-79, 88, and 93-96.

149.    Through themselves and/or their representatives, Defendants charged unfairly high prices through a bait and switch scheme exhibited in ¶¶'s 14-15, 21-22, 31, 36, and 59 that involved the Defendants selling the vehicle to Ms. Sterling then requiring her to not only return the vehicle, but then also changed the terms required to keep the vehicle.

150.    Under the MCPA, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title. MCPA § 13-408(a).

151.    Under the MCPA, "the court may enter any order of judgment necessary to:  (1) Prevent the use by a person of any prohibited practice; (2) Restore to a person any money or real or personal property acquired from him by means of any prohibited practice." MCPA § 13-406.

152.    Under the MCPA Defendants are liable for treble damages, and Ms. Sterling's cost of suit including reasonable attorney fees.

**Count VII: Violation of the Maryland Fair Debt Collections Practices Act**

153.    Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

154.    Defendants are subject to the Maryland Fair Debt Collections Practices Act, 15 Md. Code Ann. § 14-201 et seq. ("MDFDCPA") as "collectors" as defined by MDFDCPA § 14-201(b) ("[a collector] means a person collecting or attempting to

collect an alleged debt arising out of a consumer transaction.").

155.    The MDFDCPA under 15 Md. Code Ann. § 14-202(3) prohibits Defendants from engaging in conduct to, "[d]isclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false[.]"

156.    The MDFDCPA under 15 Md. Code Ann. § 14-202(5) prohibits Defendants from engaging in conduct to, "[d]isclose or threaten to disclose to a person other than the debtor … information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information."

157.    The MDFDCPA under 15 Md. Code Ann. § 14-202(8) prohibits Defendants from engaging in conduct to, "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist[.]"

158.    Defendants violated the MDFDCPA under 15 Md. Code Ann. §§ 14-202(3), (5), and (8) by (A) speaking loudly in the present of third parties, without a legitimate business need, about Ms. Sterling's personal business regarding financing of the Equinox, (B) making exclamations about Ms. Sterling not having been approved for financing or for financing being a problem for her, (C) claiming that Ms. Sterling had not been approved for financing, (D) requiring Ms. Sterling to return the vehicle, (E) requiring Ms. Sterling to take back the Trailblazer, (F) demanding that Ms. Sterling pay additional amounts of money, as exhibited in ¶¶'s 14-15, 21-22, 31, 34, 36, 59, and 68-70.

159.    The Defendants' conduct subjected Ms. Sterling to significant emotional harm, and an unjust injury Defendants cannot remedy through other means.

160.     "A collector who violates any provision of this subtitle is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish

suffered with or without accompanying physical injury." 15 Md. Code Ann. § 14-203.

### Count VIII: Violation of Maryland Motor Vehicles Administration Orders

161.    The Defendants engaged in conduct that has been banned by the Maryland Motor Vehicle Administration ("MVA").

162.    The MVA's directive regarding prohibition of the Defendants' conduct is contained in its Dealer Bulletin No. D 03-05-01 (March 10, 2005), which states:

> Temporary registration permits, or certificates and plates, may not be used by dealers in cases where vehicles are released to potential purchasers prior to consummation of a vehicle sales transaction. These types of transactions are commonly referred to in the industry as "Spot Delivery," "Fronting" "Macarthur Statement," etc.

> Maryland Vehicle Law and Agency Regulations provide for issuance of types of temporary registrations only in the case of bona fide sales. As this Administration has advised in previous Bulletins, a bona fide sale exists only after all financial arrangements and any other prerequisite conditions have been met. Until such time, there has been no sale and temporary registrations may not be issued....

> Complaints about spot delivery have been the result of "Supplemental Contracts" that are added to finance contracts stating financing has not been finalized contrary to agency regulation. Dealers are advised not to use these "Supplemental Contracts", which have resulted in financing at higher rates than originally contracted, and failure to return deposits, and failure to return trade-in vehicles.

163.    Here, the Defendants consummated a bona fide sale of the Equinox to Ms. Sterling and issued temporary plates in accordance therewith (as exhibited in ¶¶'s 47-48); however Defendants claimed that the sale was not bona fide, and insofar as Defendants issued temporary plates and/or other certifications, while not believing the sale to be bona fide,

Defendants conduct constituted a bona fide sale and cannot be taken back by them, which violated the MVA rules and regulations.

### Count IX: Fraud

164.    Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

165.    At all relevant times, the Defendants and their representatives held themselves out as professionals in the sales industry, deserving of trust and confidence, and as such, they owed a legal duty including a fiduciary duty to the Plaintiff.

166.    At all times during these matters, the Plaintiff reasonably relied upon the representations made by Defendants' and their agents.

167.    Defendants had a duty to disclose all material terms of the Sale and Financial Package to the Plaintiff and to act in good faith and to act fairly in their dealings with the Plaintiff.

168.    Defendants made various misrepresentations, failed to properly inform the Plaintiff during the purchase, and engaged in unacceptable, inappropriate, abusive, and incompetent sales practices as referenced in ¶¶'s ¶¶'s 10 to 96, including but not limited to failing to inform Ms. Sterling that the contract to purchase the Equinox was contingent upon the financing.

169.    Defendants made these false representations, either knowingly or with reckless indifference as to the truth, for the purpose of defrauding, and various parties have rightfully relied on the misrepresentations and Plaintiff has suffered compensable injury resulting from the misrepresentations.

170.    The misrepresentations, mismanagement, and lending practices directly subjected Ms. Sterling to an increased debt, stress, higher payments, and potential credit damage, through no fault of her own, constituting a significant financial and emotional harm upon her, and an unjust injury.

## Count X: Negligence & Breach of Fiduciary Duty and Implied Covenants of Good-Faith and Fair Dealing

171.    Ms. Sterling incorporates by reference all of the preceding paragraphs of this Complaint as if fully restated herein.

172.    At all relevant times, the Defendants and their representatives held themselves out as professionals in the sales industry, deserving of trust and confidence, and as such, they owed a legal duty including a fiduciary duty to the Plaintiff.

173.    At all times during these matters, the Plaintiff reasonably relied upon the representations made by Defendants' and their agents.

174.    Defendants had a duty to disclose all material terms of the Sale and Financial Package to the Plaintiff and to act in good faith and to act fairly in their dealings with the Plaintiff.

175.    Defendants breached this duty by making misrepresentations, failing to properly inform the Plaintiff during the purchase, and engaging in unacceptable, inappropriate, abusive, and incompetent sales practices as referenced in ¶¶'s 10 to 96.

176.    The misrepresentations, mismanagement, and lending practices directly subjected Ms. Sterling to an increased debt, stress, higher payments, and potential credit damage, through no fault of her own, constituting a significant financial and emotional harm upon her, and an unjust injury.

## Count XI: Respondeat Superior

177.    Ms. Sterling hereby incorporates the foregoing paragraphs as though fully set forth herein.

178.    This is an action for declaratory judgment for the purposes of determining a question of actual controversy between the parties.

179.    Ms. Sterling seeks a declaration of her rights with respect to Ourisman under the theory of Respondeat Superior.

180.    Ms. Sterling alleges that Ourisman is vicariously liable
for the acts and obligations of the other Defendants regarding
the unlawful conduct alleged herein.


WHEREFORE, Ms. Sterling prays that this Court enter judgment against
Defendants individually and severally for the following, which
Plaintiff demands as relief:


1. Hold Ourisman vicariously liable for the acts and omissions of
   its co-defendants.

2. Enter judgment against Defendants and in favor of Plaintiff for
   the maximum statutory allowance and for compensatory damages for
   each violation by Defendants of the FDCPA, RICO, TILA, FCRA,
   ECOA, MCPA, and MDCPA, including costs of suit and attorney fees;

3. Enter judgment against Defendants and in favor of Plaintiff for
   compensable and punitive damages under the tort theories of
   liability;

4. Enjoin Defendant from conduct violating FDCPA, RICO, TILA, FCRA,
   ECOA, MCPA, MDCPA, and the tort causes of action;

5. Award Plaintiff the maximum amount of monetary civil penalties
   from each Defendant for each violation of the FDCPA, RICO, TILA,
   FCRA, ECOA, MCPA, and MDCPA;

6. Order Defendants to return any and all monies paid by Ms.
   Sterling to them;

7. Award Plaintiff a judgment for actual damages to be determined at
   trial, including attorneys' fees and costs;

8. Assess punitive damages against Defendants; and,

9. Award Plaintiff such additional relief as the Court deems just
   and proper.


DATED:  October 31, 2012,


                              Respectfully Submitted,

                              **/s/**

                              _____

                              Tyler Jay King, Esq.
                              1407 Nicholson St., NW
                              Washington, DC  20011
                              (202) 436-2641

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable as such.

Respectfully submitted,

**/s/**

_____

Tyler Jay King, Esq.